UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JORGE CORENA,<br><br>        Plaintiff,<br><br>    v.<br><br>RODRIGUEZ, et al.,<br><br>        Defendants. | Case No. 1:16-cv-01025-LJO-EPG (PC)<br><br>FINDINGS AND RECOMMENDATIONS, RECOMMENDING THAT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT BE GRANTED IN PART, AND THAT PLAINTIFF BE DEEMED TO HAVE EXHAUSTED HIS AVAILABLE ADMINISTRATIVE REMEDIES AS TO ONE CLAIM<br><br>(ECF NOS. 51 & 87)<br><br>OBJECTIONS, IF ANY, DUE WITHIN FOURTEEN DAYS |

## I.     BACKGROUND

Jorge Corena ("Plaintiff") is a state prisoner proceeding *pro se* and *in forma pauperis* with this civil rights action filed pursuant to 42 U.S.C. § 1983.  This action proceeds on Plaintiff's claims "against defendants Rodriguez, Cerveza, and Doe for excessive force in violation of the Eighth Amendment, against the Doe defendant for failure to protect in violation of the Eighth Amendment, and against defendants Rodriguez and Doe for retaliation in violation of the First Amendment."  (ECF No. 26, p. 2).

On October 26, 2018, Defendant Rodriguez filed a motion for summary judgment based on the alleged failure of Plaintiff to exhaust available administrative remedies prior to filing suit, as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a).  (ECF

No. 51). Plaintiff filed a declaration opposing the motion for summary judgment on November 19, 2018, (ECF No. 59), along with a request for judicial notice with various exhibits attached (ECF. No. 58). Defendant Rodriguez filed a reply on November 26, 2018. (ECF No. 61). Plaintiff, without first seeking Court approval, filed a response to the reply on December 6, 2018. (ECF No. 63). The Court held a hearing on the motion on December 19, 2018. (ECF No. 67). The Court then set an evidentiary hearing to determine certain disputes of fact (ECF Nos. 69 & 72). On February 27, 2019, Plaintiff filed another request for judicial notice. (ECF No. 82). The Court held the evidentiary hearing on March 27, 2019. (ECF No. 87).

After careful consideration of the record, the Court recommends granting summary judgment based on a failure to exhaust administrative remedies as to Plaintiff's claims against Defendant Rodriguez stemming from alleged actions taking place on or about July 15, 2014,[1] which gave rise to claims for excessive force and retaliation against Defendant Rodriguez. The Court finds that Plaintiff never filed a grievance addressing Defendant Rodriguez's alleged second use of force, alleged to have taken place on or about July 15, 2014.

However, Plaintiff filed a grievance regarding Defendant Rodriguez's alleged use of excessive force on July 9, 2014. As described below, Plaintiff did not appeal this grievance to the third level, and the Court held an <u>Albino</u> evidentiary hearing regarding the circumstances related to the processing of that grievance. For the reasons described below, the Court recommends denying summary judgment regarding the July 9, 2014 excessive force claim and finding that Plaintiff exhausted all available administrative remedies as to this claim because the preponderance of evidence supports that Plaintiff did not receive a copy of the response to his grievance or a copy of his original 602, and thus could not appeal the denial of that grievance to the third level.

\\\

\\\

---

[1] The date of the alleged second excessive force incident is unclear. In Plaintiff's original complaint, Plaintiff alleged that the incident occurred on July 17, 2014. However, in the Second Amended Complaint Plaintiff appears to allege that the incident occurred on July 15, 2014. For purposes of these findings and recommendations, the Court will refer to the incident as having occurred on July 15, 2014.

## I.  PROCEDURAL BACKGROUND

### a.  Plaintiff's Allegations

Plaintiff filed his original complaint on July 15, 2016.  (ECF. No. 1).  The case now proceeds on his Second Amended Complaint, filed on June 19, 2017.  (ECF No. 14).  Plaintiff alleges as follows:

On July 9, 2014, Plaintiff was incarcerated at California Correctional Institute ("CCI"), which is located in Tehachapi.  That day, Defendant Rodriguez told Plaintiff to get ready for church, where Plaintiff worked as chaplain's assistant.  Defendant Rodriguez then told Plaintiff: "'you think you're slick motherfucker; I got you.'"  Plaintiff then exited his cell, went downstairs, and entered the sally port.  In the sally port, Plaintiff saw that Defendant Cerveza had taken off his green correctional officer shirt.  When Plaintiff attempted to exit the sally port, his exit was blocked by Defendant Rodriguez and Defendant Doe.

Defendant Cerveza told Plaintiff to turn around and cuff up.  Plaintiff complied.  Once Plaintiff was in handcuffs, Defendant Cerveza assaulted Plaintiff by striking Plaintiff on his face.  Defendant Rodriguez joined in, hitting Plaintiff on his back. Defendant Rodriguez then pulled out his baton and started jabbing Plaintiff in the back while Defendant Doe struck him on his face and torso.  Either Defendant Rodriguez or Defendant Doe then dragged Plaintiff to the floor.  Once Plaintiff was on the floor, Defendants Rodriguez, Cerveza, and Doe began kicking him, punching him, and stomping on him.

On July 10, 2014, Plaintiff went to medical to report the severe back pain he suffered as a result of the beating. The medical staff gave Plaintiff a shot to relieve the pain and prescribed Tylenol with codeine.

On July 15, 2014, Plaintiff reported the beating to Defendant Fiddler.  Defendant Fiddler told Plaintiff he would look into it, but never got back to Plaintiff.

Defendant Rodriguez went into Plaintiff's cell while Defendant Doe held the door and acted as Defendant Rodriguez's lookout.  Defendant Rodriguez again beat Plaintiff with his fists, kicked him, and told him "'if you keep on snitching it will keep happening to you.'"  When Plaintiff went to medical following this assault, the medical staff told Plaintiff to just

3

take his pills.  Plaintiff did not report the incident to medical staff because he was afraid of being beaten again.

Plaintiff then returned to his building.  He was in so much pain he could not eat or sleep.

After Plaintiff entered the building on July 17, 2014, he started walking up the stairs to his cell.  Plaintiff next remembers waking up on the floor face down.  Plaintiff could not move his legs.  Defendant Rodriguez and another officer were debating who would hit the alarm, because the correctional officer who hits the alarm is required to write the incident report.

Plaintiff was placed on a gurney and taken to medical.  At medical, Defendant Smith asked what happened, but Plaintiff could not respond because Defendants Rodriguez and Cerveza were present.  Although it was clear that Plaintiff had just suffered a beating, Defendant Smith told Plaintiff "to take it like a man walk back and take it like a man."  Plaintiff could not feel or move his legs.  Plaintiff remained silent for fear of retaliation.

The medical staff then examined Plaintiff's legs.  Plaintiff informed the medical staff that he could not feel his legs.  Medical staff then waited two hours, debating whether to transport Plaintiff to a hospital in Bakersfield by Air-Vac or simply call a local ambulance.  After one to four hours, Plaintiff was taken by ambulance to Desert Valley Hospital in Tehachapi where the staff did x-rays and physical tests.  Plaintiff was then transported to Mercy Hospital.

At Mercy Hospital, medical staff inserted a catheter, but Plaintiff could not feel it.  Mercy Hospital medical staff did more x-rays and an MRI.  Plaintiff was then taken to a holding cell and admitted to the hospital.  At the hospital, three doctors examined Plaintiff and approved him for surgery the next day.  Plaintiff suffered "'essentially complete paralysis of his bilateral lower extremities . . . with complete loss of both motor and sensory function.'"

After surgery, Plaintiff was returned to CCI. Within 24 hours or so, Plaintiff was sent to a California Department of Corrections and Rehabilitation ("CDCR") treatment facility, where he stayed for 90 days while recovering from surgery.  Afterwards, Plaintiff was returned to CCI.

4

On December 8, 2014, Plaintiff was transported to California Substance Abuse Treatment Facility ("SATF") as a layover stop en route to R.J. Donovan State Prison, which is designated as an institution for inmates with high risk medical needs.

Following several screening orders and amendments, District Judge Dale A. Drozd held that this action shall "proceed only on plaintiff's claims against defendants Rodriguez, Cerveza, and Doe for excessive force in violation of the Eighth Amendment, against the Doe defendant for failure to protect in violation of the Eighth Amendment, and against defendants Rodriguez and Doe for retaliation in violation of the First Amendment." (ECF No. 26, p. 2)

### b. Defendant Rodriguez' Motion for Summary Judgment

Defendant Rodriguez filed a motion for summary judgment based on the alleged failure of Plaintiff to exhaust available administrative remedies prior to filing suit. (ECF No. 51). Defendant Rodriguez argues in his motion:

> Because this action has been brought by a prisoner incarcerated by the California Department of Corrections and Rehabilitation ("CDCR") with respect to prison conditions under federal law, Plaintiff is required to exhaust his administrative remedies under the PLRA before bringing suit in court.
>
> The CDCR has an administrative process whereby an inmate under the CDCR's jurisdiction may appeal any policy, decision, action, condition, or omission by the CDCR or its staff that the inmate can demonstrate has a material adverse effect upon the inmate's health, safety, or welfare. (SUF No. 9.) With limited exceptions, an appeal must be reviewed at the Third Level and a decision must be issued in order for administrative remedies to be deemed exhausted. (SUF No. 10.)
>
> On or about August 20, 2014, Plaintiff filed an administrative appeal complaining about Defendant Rodriguez's and the unserved co-defendants' actions, alleging excessive force, retaliation, and deliberate indifference to serious medical needs. (SUF Nos. 11, 25.) The CDCR Appeals Coordinator bypassed the First Level of Appeal, and sent Plaintiff's appeal directly to the Second Level of Review. (SUF No. 12.) Pursuant to California regulations, an investigative sergeant interviewed Plaintiff regarding his appeal; Plaintiff was interviewed on October 8, 2014 and provided no additional information or evidence during the interview. (SUF No. 14.) Plaintiff did, however, note that he wished to be "transferred to a medical facility, to be away from the officers that attacked [him]" and that "this matter be investigated by an outside agency." (*Id.*) On October 16, 2014, Plaintiff was issued a Second Level Response with the finding that "no violation of California Department of Corrections and

5

> Rehabilitation policy." (SUF No. 12.)
>
> Following the denial of Plaintiff's appeal at the Second Level of Review,
> Plaintiff did not make any further submissions to pursue his appeal to the Third
> Level of Review. (SUF No. 26.)
>
> . . .
>
> Therefore, Plaintiff was provided the opportunity to submit an administrative
> appeal to the Third Level of Review, but chose not to pursue his appeal beyond
> the Second Level of Review. Consequently, Plaintiff's administrative appeal
> never completed the Third Level of Review, and he did not exhaust
> administrative remedies with respect to his claims in this action. (SUF No. 30.)

(ECF No. 51, at pgs. 8-9).

In the alternative, Defendant Rodriguez argues that claims related to the second excessive force incident should be dismissed because they were not described in the grievance. (ECF No. 51, at p. 15 ("Specifically, the administrative appeal Plaintiff filed only mentions the alleged July 9, 2014 incident; there is no mention of a second incident on July 15, 2014. (SUF No. 35.) Thus, Plaintiff failed to exhaust any claims arising from and give fair notice relating to the alleged July 15, 2014 incident.")).

Plaintiff submitted a "Declaration," and "Request for Judicial Notice" in opposition to Defendant's motion. In the declaration, Plaintiff stated that on August 20, 2014, he filed a grievance, which was sent to the second level. An interview of Plaintiff was conducted on October 8, 2014. On December 8, 2014, Plaintiff arrived at SATF. On January 20, 2015, after realizing that his grievance forms were lost during the transfer, he filed a Form 22 requesting a copy of his grievance. He filed another Form 22 on March 5, 2015, and on March 20, 2015, he filed a grievance for the lost/damaged grievance. Plaintiff never received any responses to his requests. As Plaintiff never received a copy of the grievance, he was unable to forward the grievance to the third level. Thus, Plaintiff argues that administrative remedies were not available to him.

In the request for judicial notice, Plaintiff attached multiple prison forms dated after the incident asking for copies of the grievance and other paperwork related to the grievance. (ECF No. 58). For example, in a grievance dated March 20, 2015, Plaintiff claimed that he "arrived

here from tehachapi [sic] (CCI) and custod [sic] lost or damaged my 602 on custody at (CCI).  I

have filled out (2) two request [sic] at this prison.  SATF and my request on 22 Forms have

been ignored dated 1-20-15 and 3-5-15.”  (ECF No. 58, at p. 6).  Plaintiff requested “copys

[sic] of my 602 at Tehachapi (CCI) so I can forward it to the third level.”  (Id.).

### c.  Court Orders Evidentiary Hearing

Following a hearing on the motion, the Court ordered an evidentiary hearing to resolve

disputes of fact related to Defendant’s motion.  The Court explained as follows:

> Defendant Rodriguez argues, in part, that Plaintiff failed to exhaust his available
> administrative remedies because Plaintiff failed to appeal his second level
> response to the third level of review.  However, Plaintiff has alleged (and
> submitted evidence) that he never received the second level response, and so
> was unable to appeal to the third level of review.
>
> While Defendant Rodriguez argued that it does not matter whether Plaintiff
> physically received the second level response (because he was on notice that it
> had been issued), Defendant Rodriguez cited to no authority to support this
> proposition.  Moreover, the California Code of Regulations appears to require
> that Plaintiff actually receive a copy of the second level response, and there
> appears to be a dispute of fact regarding whether Plaintiff actually received the
> second level response. Cal. Code Regs. tit. 15, § 3084.8(b)(3) (emphasis added)
> (“Except as described in subsection 3084.8(b)(4), an inmate or parolee must
> submit the appeal within 30 calendar days of… *receiving* an unsatisfactory
> departmental response to an appeal filed.”); Cal. Code Regs. tit. 15, § 3084.7(h)
> (emphasis added) (“At the first and second level of review, *the original
> appeal… shall be returned to the appellant* with a written response to the appeal
> issue providing the reason(s) for each decision.”); Cal. Code Regs. tit. 15, §
> 3084.2(d) (emphasis added) (“If dissatisfied with the second level response, the
> appellant may submit the appeal for a third level review, as described in section
> 3084.7, provided that the time limits pursuant to section 3084.8 are met. The
> appellant shall *mail the appeal* and supporting documents to the third level
> Appeals Chief via the United States mail….”).  As discussed at the hearing,
> there are disputes of fact regarding whether Plaintiff ever received the second
> level response and whether he took efforts to obtain the response in order to
> pursue an appeal to the third level.  These disputes of fact appear material to the
> legal issues presented.
>
> As there appears to be a genuine dispute of material fact regarding whether
> Plaintiff actually received the second level response, as well as his actions after
> he was allegedly told about the second level response, the Court will set an
> evidentiary hearing to resolve these disputes.

(ECF No. 69, at pgs. 1-2) (footnote omitted).

## II.  LEGAL STANDARDS

### A.  Exhaustion

"The California prison grievance system has three levels of review; an inmate exhausts administrative remedies by obtaining a decision at each level." Reyes v. Smith, 810 F.3d 654, 657 (9th Cir. 2016) (citing Cal. Code Regs. tit. 15, § 3084.1(b) (2011) & Harvey v. Jordan, 605 F.3d 681, 683 (9th Cir. 2010)). See also Cal. Code Regs. tit. 15, § 3084.7(d)(3) ("The third level review constitutes the decision of the Secretary of the California Department of Corrections and Rehabilitation on an appeal, and shall be conducted by a designated representative under the supervision of the third level Appeals Chief or equivalent.  The third level of review exhausts administrative remedies….").

Section 1997e(a) of the Prison Litigation Reform Act of 1995 ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).

Prisoners are required to exhaust the available administrative remedies prior to filing suit. Jones v. Bock, 549 U.S. 199, 211 (2007); McKinney v. Carey, 311 F.3d 1198, 1199-1201 (9th Cir. 2002) (per curiam).   The exhaustion requirement applies to all prisoner suits relating to prison life. Porter v. Nussle, 534 U.S. 516, 532 (2002).  Exhaustion is required regardless of the relief sought by the prisoner and regardless of the relief offered by the process, unless "the relevant administrative procedure lacks authority to provide any relief or to take any action whatsoever in response to a complaint." Booth v. Churner, 532 U.S. 731, 736, 741 (2001); Ross v. Blake, 136 S.Ct. 1850, 1857, 1859 (2016).

"Under the PLRA, a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought.  The grievance need not include legal terminology or legal theories, because [t]he primary purpose of a grievance is to alert the prison to a problem and facilitate its resolution, not to lay groundwork for litigation.  The grievance process is only required to alert prison officials to a problem, not to provide personal notice to a particular official that he may

8

be sued." Reyes, 810 F.3d at 659 (alteration in original) (citations and internal quotation marks omitted).

As discussed in Ross, 136 S.Ct. at 1862, there are no "special circumstances" exceptions to the exhaustion requirement. The one significant qualifier is that "the remedies must indeed be 'available' to the prisoner." Id. at 1856. The Ross Court described this qualification as follows:

> [A]n administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates. See 532 U.S., at 736, 738, 121 S.Ct. 1819. . . .
>
> Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. . . .
>
> And finally, the same is true when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation. . . . As all those courts have recognized, such interference with an inmate's pursuit of relief renders the administrative process unavailable. And then, once again, § 1997e(a) poses no bar.

Id. at 1859–60.

"When prison officials improperly fail to process a prisoner's grievance, the prisoner is deemed to have exhausted available administrative remedies." Andres v. Marshall, 867 F.3d 1076, 1079 (9th Cir. 2017).

If the Court concludes that Plaintiff has failed to exhaust, the proper remedy is dismissal without prejudice of the portions of the complaint barred by section 1997e(a). Jones, 549 U.S. at 223–24; Lira v. Herrera, 427 F.3d 1164, 1175–76 (9th Cir. 2005).

### B. Summary Judgment

Summary judgment is appropriate when it is demonstrated that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Albino v. Baca ("Albino II"), 747 F.3d 1162, 1169 (9th Cir. 2014) (en banc) ("If there is a genuine dispute about material facts, summary judgment will not be granted."). A party asserting that a fact cannot be disputed must support the assertion by "citing to

particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials, or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). If the moving party moves for summary judgment on the basis that a material fact lacks any proof, the Court must determine whether a fair-minded fact-finder could reasonably find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [fact-finder] could reasonably find for the plaintiff."). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 322. "[C]onclusory allegations unsupported by factual data" are not enough to rebut a summary judgment motion. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989), citing Angel v. Seattle-First Nat'l Bank, 653 F.2d 1293, 1299 (9th Cir. 1981).

In reviewing a summary judgment motion, the Court may consider other materials in the record not cited to by the parties, but is not required to do so. Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1031 (9th Cir. 2001). In judging the evidence at the summary judgment stage, the Court "must draw all reasonable inferences in the light most favorable to the nonmoving party." Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011). It need only draw inferences, however, where there is "evidence in the record… from which a reasonable inference… may be drawn"; the court need not entertain inferences that are unsupported by

fact. Celotex, 477 U.S. at 330 n. 2 (quoting In re Japanese Electronic Products Antitrust Litigation, 723 F.2d 238, 258 (1983)).

In a summary judgment motion for failure to exhaust, the defendants have the initial burden to prove "that there was an available administrative remedy, and that the prisoner did not exhaust that available remedy." Albino II, 747 F.3d at 1172. If the defendants carry that burden, "the burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." Id. However, "the ultimate burden of proof remains with the defendant." Id. "If material facts are disputed, summary judgment should be denied, and the district judge rather than a jury should determine the facts." Id. at 1166.

While parties may be expected to simply reiterate their positions as stated in their briefs, one of the purposes of an evidentiary hearing is to "enable [ ] the finder of fact to see the witness's physical reactions to questions, to assess the witness's demeanor, and to hear the tone of the witness's voice. . . .'" United States v. Mejia, 69 F.3d 309, 315 (9th Cir. 1995). All of this assists the finder of fact in evaluating the witness' credibility. Id. It is only in "rare instances" that "credibility may be determined without an evidentiary hearing. . . ." Earp v. Ornoski, 431 F.3d 1158, 1169–70 (9th Cir. 2005).

## III.     ANALYSIS OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant's motion for summary judgment is based on two arguments. First, that Plaintiff failed to submit his grievance to the third level. Second, that the scope of the grievance failed to include the second excessive force incident, which took place on July 15, 2014.

The Court recommends denying Defendant's motion for summary judgment as to the first ground because there is a material dispute of fact. Defendant claims that the result of the second level review was delivered to Plaintiff on October 16, 2014, and that Plaintiff failed to appeal the response to the third level. Defendant submitted evidence in support of its contention, including the response from the second level dated October 10, 2014. (ECF No. 51-3, at p. 8). Plaintiff, in contrast, claims that he failed to receive the second level response

and submitted evidence in support of his contention, including forms he allegedly submitted requesting a copy of the grievance. (ECF No. 58 & 59). As described above in the Court's order setting an evidentiary hearing, (ECF No. 69), this factual dispute is material. If Plaintiff never received the second level response, or paperwork necessary to pursue his grievance to the third level, then that part of the process was not available to him.

The Court recommends granting Defendant's motion for summary judgment as to the second ground because it is undisputed that the grievance Plaintiff submitted did not cover any second incident of excessive force by Defendant Rodriguez. Defendant submitted a copy of the relevant grievance with his motion for summary judgment. (ECF 51-3, at pgs. 10-14). Plaintiff admits that it is a true copy of the grievance. That grievance states as follows:[2]

> On July 9, 14 I was in my cell when C.O Rodriguez came to my cell 236 and told me that I was wanted for catholic services so I got ready. As I walked down the stairs I seen a C.O. by the office door when I walked into the "rotunda" under the tower the door was locked and their [sic] was an officer C.O. Cerveza was standing there in a white T-shirt with no belt on I then quickly turned to see (2) C.Os one being C.O. Rodriguez standing there blocking me in the hallway. We exchanged some words some "SOB's and MFs." I was instructed to cuff up by C.O. Rodriguez. I asked why the answer was "That I'm known for assaulting peace officers" so I complied. Once I was in hand cuffs I turned my head and seen C.O. Rodriguez taking off his belt. I seen C.O. Cerveza approach me as he hit me with a close fist. I was also hit by a stick from behind. I was kneed as I hit the floor. I was kicked, kicked, kicked, and kicked some more. I was uncuffed and called "a piece of shit" that is a derogatory nickname for my custody status once they left into the dayroom I got up and walked toward my cell. That's where I stayed in all day. When night came I couldn't sleep all night so in the morning I went over to medical instead of going to breakfast. In medical I was attended and given a shot then later sent to x-rays. When I returned C.O. Cerveza told me to go to my unit instead of returning to medical as advised by medical staff. I was later called at lunchtime have to go to medical where I gave my (I.d.) to C.O. cerveza and he "advised" me not to be stupid in any way. I was given pills seen the doctor then went on back to my housing unit. I was put in bed rest for 10 days when I was in I asked about how I got my injury. I said "I was sitting down in my cell with one foot on the stool I brought my foot down that's when I heard a pop on my back." "I lied" cause

---

[2] The Court asked Plaintiff to read the grievance at the evidentiary hearing, and has referred to that part of Plaintiff's testimony to ensure accurate transcription of the grievance, which is in small handwriting and difficult to read. Even though the Court has referred to testimony given at that hearing, summary judgment is still appropriate because there was no dispute of fact regarding its contents, which were submitted in connection with a motion for summary judgment.

they had to do an (incident report) and turn it in to custody and the C.O. in medical was the one that beat me and jumped with other officers I had no choice it was either that or suffer retaliation. I was called every day into medical and one day I was in a little room being asked the same question "what happened." Well today was different cause one of the nurses left the room the room and the doctor looked up and said he had an idea of what happened he said "look." So I turned and seen (2) sergeants and (6) C.O.'s including C.O. Cerveza. I stayed quiet and stuck to my story (1) sergeant was on the phone so I had no choice but to remain silent for my own safety. Several days later I told C.O. Nelson that his buddies [sic] had done "this" meaning put a whupping on me he stayed quiet. By this time I think I was already in crutches. The doctor had told me if I refuse to tell him (what really happened) he would take me off my pain medication and he did. Even though I was on crutches he had me on the 2nd "tier" floor with a mobility vest on. On July 16, 14 as I was going out for my second set of x-rays I seen the psych and I gave her a sick call slip I needed to find someone to trust and tell about this both C.O.'s got mad and I was walking out I was approached by both of them (1) being C.O. Cerveza and told that they "were going to hand me/you another one, dead man." I just laughed weather [sic] it was out of nervousness or what, but I seen the person a free staff and I mentioned to her the little threat that I was told when I seen Sergeant Fiddler. I approached him and I did go out of my way to look for him and I told him that their [sic] was an incident with (3) C.O.'s I never mentioned no names I told him to please if he can get the matter resolved Sergeant Fiddler said he would see he never got back at me. I told "him" what I told the Doctor "him" being Sergeant Fiddler he said that that's good and I mentioned I did my part to stay quiet they needed to do their part and resolve this issue. I told Sgt. Fiddler what the Doctor said and that he was suspicious so "he" Sgt. Fiddler came up with a story about how "it was done by me and my celly goofing around in the cell" . . . I mentioned this to my celly "Paul Olivares #AN 3248." Olivares said "he didn't want to be mixed up or get in trouble cause that wasn't true then they would want to write him up." On July 17th I went to medical and "everyone" was [illegible] me inmates and free staff the only ones that weren't was the nurses "males" to be more specific. After a regular check I went back by this time I had (3) days without eating and (2) days without sleeping cause I was cut off my pain medication. I walked across the yard. I got light headed. I was exhausted by the time I got to the block once I started to climb the stairs. I got dizzy and all I remember was that I seen my knee by my face and orange then when I opened my eyes I was flat on the ground laying on my stomach. The dayroom was open so a lot of people seen me fall. I was moved then later taken to the clinic where the doctor said I was faking it and in the mix I asked the nursing staff if I could talk to the C.O. It was a long time before C.O. Cerveza and C.O. Rodriguez walked in I was quiet for a while before I said "that I couldn't feel my legs." They just laughed and someone said "that's what I get for fucking with someone's wife." I stayed quiet. I asked to talk to the sergeant and I would like Sgt. Fiddler instead Sgt. Smith walked in and said "why was I not facing what I had coming." I just lay there not saying anything. I was later transported to the hospital and declared

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

paralyzed and again transferred to another where emergency surgery was performed and now I'm learning how to walk. As for a motive I was having an affair with a state employee we met many years ago in Los Angeles. I never knew she was married. I knew nothing of "her" husband "ex" which is what she called him. Me and "her" had an argument at the prison cause she found out I was dealing "methamphetamines" in the streets and other drugs. In class I was screamed at and humiliated by the name calling and other comments. We had several conversations on this and it caught the attention of the C.O.s. "Her" name is Hilary Jarvis the woman in the middle of the thing. My name is Jorge Corena #AI8181 caught in their little drama.

While this grievance is not limited in time to July 9, it does not describe any second incident of excessive force by Defendant Rodriguez. Thus, the claim for excessive force in Plaintiff's Second Amended Complaint based on the allegation that on July 15, 2014, "Defendant Rodriguez went into plaintiff's cell while Defendant Doe held the door and acted as defendants [sic] look out. Defendant Rodriguez again beat plaintiff with his fists, kicked him and told him 'if you keep on snitching it will keep on happening to you,'" (ECF No. 14, at pgs. 5-6), should be dismissed for failure to exhaust administrative remedies. As this second incident was also the basis of the retaliation claim against Defendant Rodriguez, (ECF No. 7, at p. 11; ECF No. 16, at p. 5; ECF No. 20, at p. x), the retaliation claim against Defendant Rodriguez should also be dismissed.

The Court thus recommends granting Defendant Rodriguez' motion for summary judgment in part as to the second claim for excessive force against Defendant Rodriguez and the claim for retaliation based on that same incident against Defendant Rodriguez.

## IV. ANALYSIS OF AVAILABILITY OF ADMINISTRATIVE REMEDIES AS TO THE FIRST EXCESSIVE FORCE CLAIM AGAINST DEFENDANT RODRIGUEZ

### A. Summary of Relevant Evidence

On March 27, 2019, the Court held an evidentiary hearing regarding disputes of fact concerning the exhaustion of administrative remedies, i.e., whether an appeal to the third level was "available" under the case law. Plaintiff testified on his own behalf. Defendant Rodriguez called the following witnesses on his behalf: Jason Barba, Bradford Sanders, Jr., Jorge Dominguez, and Jerry Wood. Additionally, fourteen exhibits were admitted into evidence.

Many relevant facts were undisputed, including that the process with the CDCR at the time required an appeal to the third level in order to exhaust administrative remedies, and that Plaintiff failed to submit his appeal to the third level. It was also undisputed that the CDCR issued a response at the second level, denying Plaintiff's appeal, on October 10, 2014. The main dispute of fact is whether that response at the second level, and the original grievance that would have been attached, were ever physically delivered to Plaintiff in a way that allowed him to submit an appeal to the third level.

Plaintiff testified on his own behalf. He testified that he submitted the grievance on approximately August 18, 2014, describing the incident (as quoted above). He was then transferred multiple times for treatment of his injuries. At some point, he was transferred back to Tehachapi in a medical section of the prison, the Outpatient Housing Unit ("OHU").[3] He testified that "I didn't have nothing on me. I didn't have no personal property. You have to go a certain amount of time before you can have personal property." He then described seeing a person who purported to have this grievance, but Plaintiff did not physically receive it, as follows:[4]

> One day out of the blue I just ended up, I had an officer just come over knock on the window, call out my last name, say 'hey look I got your 602.' . . . He said, I'm going to put it with your property. You can't have personal property. He said he would write a receipt. I never got a receipt. I never thought about asking for a receipt. . . . And I was bed down at the time. . . . He said he was going to put his 602 in my property . . . I had some knowledge of them acknowledging that I had it.
>
> When I ended up getting transferred out on December 8, I ended up getting sent to SATF. When I arrived there, I didn't have nothing on me. They ended up sending my property later on. My TV had water on it. I wrote a 602 on that. . . . I also filed a request for my 602, CDCR 22 forms. I wasn't too sure about how much time they have to answer this or that. . . .
>
> I put in one request slip for 602, explained that what the 602 is about. I

---

[3] Plaintiff described how he arrived at Tehachapi, was admitted to the OHU, then back to the ICU, then back to Bakersfield hospital, then back to Tehachapi.

[4] As there is not a transcript of the hearing, this transcription is unofficial and based on the audio file, which is available to the parties upon request.

also explained how in another 22 form that needed it, think ended up
filed a 22 on March, filing a 602 in March as well. And actually have
copies of that in the box. Didn't get no response. So I wasn't given any
opportunity to actually proceed. I seen where it said about personal
property when go out to medical, goes to the primary facility. I couldn't
get it in CTC. In OHU, didn't get personal property due to the fact that it
is considered personal property. I cant have that. It is personal property.
It needs to be stored. . . . No matter how many 602 I filed, I couldn't get
possession of them. It was not in my possession and not in my property.
Never got a copy of the 602. When was in the OHU, I ended up seeing
something that officer said was my 602. I can't say it was.

Plaintiff also admitted into evidence original copies of three documents he submitted
asking for documents related to his grievance. One is a form 22 dated January 20, 2015,
submitted by Plaintiff, stating "I would like to get copys [sic] of 602 that I filed at CCI about
the assault that happened to me dated 7/2014. My paper work was taken or lost by
transportation on my transfer there at SATC from Tehachapi." (Exhibit ECF No. 58, at p. 4).
The original documents also included a Form 22 addressed to the appeals coordinator on March
5, 2015 stating "I want to know if I can request copies of my 602 for August or July 2014 at
CCI Tehachapi." (Id. at 5). Plaintiff also presented an original document (a Form 22) dated
4/1/15, stating "I have written two separate requests asking for copies of the 602 that I filed at
Tehachapi CCI at the end of the year, between July and August of 2014." (Exhibit 2).
Additionally, Plaintiff brought the original of a 602 dated 3/20/15, which states "I arrived here
from Tehachapi (CCI) and custod [sic] lost or damaged my 602 on custody at (CCI). I have
filled out (2) two request at this prison. SATF and my request on 22 Forms have been ignored
dated 1/20/15 and 3/5/15," and requests "copys [sic] of my 602 at Tehachapi (CCI) so I can
forward it to the third level." (Exhibit ECF No. 58, at p. 6). Furthermore, regarding whether he
has supporting documents, Plaintiff checked "no" and wrote "I don't have copys [sic] of the
602 cause I was at CTC and the OHU without access to a copy machine." (Id.). Plaintiff
testified he never received a response to any of these requests for documents related to his
grievance.

On cross-examination, defense counsel questioned Plaintiff on his testimony regarding
not receiving his personal property while in the OHU. Defendant submitted evidence that

Plaintiff received two pieces of legal mail during that time. Plaintiff also was able to send a letter to the prison law office while in OHU. Plaintiff admitted he did not know the name of the officer who allegedly showed him a copy of the second level response. Plaintiff admitted he had a right to get a receipt, but failed to get one and did not file a grievance about failing to get his mail. While Plaintiff was in the OHU, he also filed a grievance related to failing to have his glasses, and as a result he was allowed to keep his glasses in his cell. After Plaintiff left OHU, he filed a grievance about his TV, but did not immediately file a grievance about the missing second level response. Finally, defense counsel noted that one of the grievances he filled out in March 2015 mentions not having a copy machine in the OHU—not that Plaintiff was never given a copy of the second level response.

Defense counsel then put on multiple witnesses from CDCR, who testified about the appeals process and the failure of Plaintiff to appeal to the third level as required.

First, Jason Barba worked at SATF when Plaintiff was there and testified that inmates have access to documents in their central file.

Second, Bradford Sanders, Jr., testified on Defendant's behalf. In 2014, he was a health care access captain. He was responsible for inmates' access to care during that period. He testified that inmates were allowed to keep mail in their OHU cells. OHU inmates could use a paging service to use law library services. If an inmate needed something, he could submit a Form 22 request. The mailroom would drop off mail bags at the OHU and would deliver the mail to OHU inmates. It would be very rare, exceptional circumstances, when inmates would fail to receive their mail in the OHU. Inmate appeals were processed along with the regular mail.

On cross-examination, Plaintiff questioned Mr. Sanders regarding Title 15, section 3190(t), which states: "All allowable inmate property shall be inventoried, documented, and stored for inmates transferred Out-to-Medical or Out-to-Court, or placed in segregated housing, a Correctional Treatment Center, or an Outpatient Housing Unit, until the inmate returns." (Exhibit J, p. 22). Mr. Sanders testified that this section applies when an inmate goes out for treatment or is gone long term. In these instances, the prison would inventory and store the

inmate's property that was in his cell.  Mr. Sanders testified that this would not prevent an inmate at OHU from having property in his cell.  Plaintiff also admitted a CDC 7206 medical form signed 7/20/14, which indicated that Plaintiff was "unable to complete exam due to bed bound" while in the OHU.  (Exhibit 6).

Third, Defense counsel called Jorge Dominguez, who worked at the Office of Appeals for the past three and a half years.  He testified that third level correspondence would be considered legal mail.  Mr. Dominguez testified that if an inmate does not have his original appeal, he would not be able to submit an appeal to the third level.  If he submitted an appeal to the third level without the grievance or without the response from the second level, it would be rejected.  If an inmate indicated that staff is trying to not provide him with the grievance, the Appeals Office would follow up on that allegation to check on the validity of those allegations.  Mr. Dominguez also testified that inmates have a right to their mail.  If an inmate did not receive mail, the inmate could file a grievance requesting a copy of his grievance.  An inmate could also use a Form 22 to request a copy of his grievance.  He also testified that the Appeals Office responds to requests for missing grievances by conducting full staff inquiries to find the missing grievances.

Finally, defense counsel called Jerry Wood II.  Mr. Wood works at CCI, Tehachapi.  He worked there at the time of the incident, during 2014.  He testified about the process, including the process for returning an inmate grievance response back to the inmate.  He testified that the inmate should get the original grievance back along with the second level grievance response.  If the inmate is at CCI, he uses institutional mail.  Mr. Wood repeatedly testified that if an inmate does not receive his response, he can file a grievance or Form 22 asking for a copy of his grievance in order to pursue his appeal to the next level.  The inmate can say some version of that he has not received his grievance, and he could obtain a copy of his grievance with an indication that it should be treated as an original.   Mr. Wood also testified about the second level appeal response in this case, and testified that it indicated it had been "mailed/delivered to appellant" on October 16, 2014.  (Exhibit E).  Mr. Wood testified that he never received any documents related to Plaintiff's missing grievance.

18

Finally, Plaintiff submitted an exhibit from his time in the OHU where a doctor requested that Plaintiff be provided with regular shoes. (Plaintiff's Exhibit 8).

### B. Analysis of Evidence

The evidentiary hearing surrounded the dispute of fact as to whether Plaintiff had received the second level appeal response and accompanying original grievance, which is needed to pursue his appeal to the third level.

Defense counsel put on evidence that Plaintiff received the response, including that the second level appeal response indicates is was "mailed/delivered to appellant" on 10/16/14, and that the process at the time was to deliver such responses to inmates. Defense counsel also presented evidence that CCI had a process in place to deliver second level responses to inmates. That process provided that an inmate could file a grievance or Form 22 if he did not receive a response in time, and the appeals office would respond promptly. Defense witnesses also testified that OHU inmates should be able to keep personal property in their cell during this period. The defense witnesses appeared credible.

In contrast, Plaintiff presented evidence that he did not receive the second level response or a copy of his grievance needed to process that appeal at the third level. This included his own testimony, which appeared credible, that an officer had held up his second level response and indicated that it would be put in his property, yet it was not in his property when Plaintiff eventually received his property. Plaintiff also admitted a regulation that states, "[a]ll allowable inmate property shall be inventoried, documented, and stored for inmates transferred . . . [to] Outpatient Housing Unit," although there was a dispute about whether this applied to personal property delivered when an inmate was in OHU. The evidence indicates that Plaintiff, or his doctor, had to specifically request Plaintiff's glasses and shoes while he was in the OHU, suggesting that Plaintiff did not automatically receive all of his personal property at that time.

The Court finds the most probative evidence comprises the three original Form 22s and an original grievance that Plaintiff filed after this time requesting copies of his 602 to appeal to the third level. These include the Form 22 dated January 20, 2015, stating "I would like to get

copys [sic] of my 602 that I filed at CCI about the assault that happened dated 7/2014 . . . ," and a 602 from March 20, 2015, stating "I want copys [sic] of my 602 at Tehachapi (CCI) so I can forward it to the third level." The Court inspected the originals and they appear authentic. Defendant did not question Plaintiff as to their authenticity or otherwise provide evidence that they were not authentic. These documents clearly support Plaintiff's account of events. Not only do they corroborate Plaintiff's testimony that he did not receive the second level response and original 602, they also call into question testimony by defense counsel regarding the process at that time. Defense witnesses repeatedly testified that, if an inmate did not receive a response to an appeal, he should file a grievance or Form 22 asking for another copy of his appeal. This appears to be exactly what Plaintiff did. However, contrary to the testimony of defense witnesses, Plaintiff never received a response to these requests. These documents thus indicate that, when it came to Plaintiff and this grievance at this time, the appeals process was not working correctly. Put another way, if the appeals office failed to respond to Plaintiff's three requests for his grievance contrary to their own process, it seems likely that Plaintiff is truthfully testifying that he also failed to receive a response to his original grievance.

While not dispositive, the Court also notes that, even in his Second Amended Complaint, which was filed on June 19, 2017, Plaintiff stated (under penalty of perjury) that he filed grievances that were not processed, and that he repeatedly requested copies of the grievances he filed, but was never provided a copy. (ECF No. 14, p. 9).

Thus, after reviewing all evidence and witness testimony regarding this dispute of fact, this Court recommends finding that Plaintiff met his burden to establish that the third level of appeal was not available to Plaintiff because he did not receive the second level response to his grievance and the original grievance that were needed to pursue his appeal to the third level. Accordingly, Plaintiff should be deemed to have exhausted his available administrative remedies as to his excessive force claim against Defendant Rodriguez based on the alleged July 9, 2014 incident.

\\\
\\\

**VII. CONCLUSION AND RECOMMENDATIONS**

Accordingly, based on the foregoing, IT IS HEREBY RECOMMENDED that**:**

1.     Defendant Rodriguez's motion for summary judgment (ECF No. 51) be granted in part.

2.     The claim against Defendant Rodriguez based on the alleged July 15, 2014 excessive force incident and the claim for retaliation against Defendant Rodriguez based on that same incident be dismissed.

3.     That Plaintiff be deemed to have exhausted his available administrative remedies as to the excessive force claim against Defendant Rodriguez based on the alleged July 9, 2014 excessive force incident.

These findings and recommendations are submitted to the United States district judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). **Within fourteen (14) days** after being served with these findings and recommendations, any party may file written objections with the court. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within seven days after service of the objections. The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **April 17, 2019**            /s/ Erica P. Grosjean

                                             UNITED STATES MAGISTRATE JUDGE